UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| | | | |
|---|---|---|---|
| Case No. | LA CV14-05150 JAK (AJWx) | Date | February 5, 2015 |
| Title | Zenith Electronics, LLC, et al. v. Sceptre, Inc. | | |

| | |
|---|---|
| Present: The Honorable | JOHN A. KRONSTADT, UNITED STATES DISTRICT JUDGE |
| Andrea Keifer | Not Reported |
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:** (IN CHAMBERS) ORDER DENYING COUNTERCLAIM-DEFENDANTS' MOTION TO DISMISS THE FIRST THROUGH SIXTH COUNTERCLAIMS (DKT. 67)

**I.     INTRODUCTION**

Plaintiffs Zenith Electronics, LLC ("Zenith"), Panasonic Corporation ("Panasonic"), and U.S. Philips Corporation ("Philips") (collectively, "Plaintiffs") contend that Defendant Sceptre, Inc. ("Defendant") infringes U.S. Patent Nos. 5,802,107 ("'107 Patent"), 5,629,958 ("'958 Patent"), RE 42,643 ("'643 Patent"), and 5,684,541 ("'541 Patent"). Compl., Dkt. 1. The patents-in-suit are allegedly essential for practicing certain Advanced Television Systems Committee, Inc. ("ATSC") Standards for the transmission and reception of digital television. *Id.* at ¶¶ 14-15.

Defendant asserts that Plaintiffs, together with Counterclaim-Defendant MPEG LA, LLC ("MPEG LA") (collectively, "Counterclaim-Defendants"), through their false representations during the ATSC Standard setting process, and through their pooling, licensing, and enforcing the patents-in-suit, have violated §§ 1 and 2 of the Sherman Act and Cal. Bus. & Prof. C. § 17200, and are liable for breach of contract and under the doctrine of promissory estoppel. First Amended Counterclaims ("ACC"), Dkt. 62 at ¶¶ 113-160. Defendant has also brought counterclaims for declaratory judgment as to two matters -- the asserted patents are invalid and they are not infringed. *Id.* at ¶¶ 161-200.

On November 17, 2014, Counterclaim-Defendants filed a Motion to Dismiss the First through Sixth Counterclaims, seeking dismissal of the non-patent counterclaims (the "Motion"). Dkt. 67. On November 24, 2014, Defendant filed an opposition. Dkt. 72. On December 1, 2014, Counterclaim-Defendants filed a reply. Dkt. 76. A hearing on the Motion was held on December 15, 2014, and the matter was taken under submission. For the reasons stated in this Order, the Motion is DENIED.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-05150 JAK (AJWx) | Date | February 5, 2015 |
|---|---|---|---|
| Title | Zenith Electronics, LLC, et al. v. Sceptre, Inc. | | |

**II.      BACKGROUND**

The Defendant has alleged the following background facts. In 1987, the Federal Communications Commission ("FCC" or "Commission") initiated rulemaking to consider advanced television technologies. At the same time, it established an Advisory Committee to assist the Commission with the evaluation of proposals in this field. *See* ACC, Dkt. 62 at ¶ 32. The Advisory Committee worked with the ATSC through that process. *Id.* The Advisory Committee initially accepted 23 different proposals. By 1991, it had reduced the number of competing systems to six, including four all-digital systems. *Id.* at ¶ 33. In February 1993, the Advisory Committee requested that improvements be made to the four all-digital systems, and expressed a willingness to entertain a combined proposal. *Id.* In response, the remaining all-digital system proponents formed a "Grand Alliance," whose members included Counterclaim-Defendants Zenith and Philips. The members of the Grand Alliance then collaborated on the design of a single system, which became the ATSC Standard. *Id.* at ¶¶ 34-35. On December 24, 1996, the FCC adopted the major elements of the ATSC Standard. *Id.* at ¶ 37.

In connection with the development of this standard, the ATSC instituted rules regarding the disclosure and licensing of patents, including a requirement that members disclose potentially standard essential patents and to license them on fair, reasonable and nondiscriminatory ("FRAND") terms. *Id.* at ¶¶ 29, 39-40. The FCC's adoption of the ATSC Standard was premised on those assurances. *Id.* at ¶ 41. Plaintiffs Zenith, Philips, and Panasonic each committed to license their ATSC Standard essential patents on "reasonable terms and conditions that are demonstrably free of any unfair discrimination." *Id.* at ¶ 42.

In the late 1990s or early 2000s, Zenith began to attempt to license its ATSC Standard essential patents. *Id.* at ¶ 50. That effort included negotiations and litigation. *Id.* at ¶¶ 52-54. In 2004, Counterclaim-Defendant MPEG LA, a licensing administrator, called for submissions of patents essential to the ATSC Standard. *Id.* at ¶¶ 57-58. Discussions in June 2005 involved certain patentees, including Panasonic and Philips, but not Zenith. *Id.* MPEG LA's discussions with Zenith took place in late 2006 or early 2007. In April 2007, MPEG LA proposed a royalty rate for the ATSC pool, including Zenith's patents, of $5 per unit. *Id.* at ¶¶ 60-61.

The ATSC patent pool at issue in this case is modeled after another patent pool administered by MPEG LA, for the MPEG-2 audio and video compression technology. *See id.* at ¶ 67. In connection with that pool, MPEG LA obtained a "Business Review Letter" from the Antitrust Division of the Department of Justice. *Id.*; Business Review Letter from Joel I. Klein, Assistant Attorney Gen., Dep't of Justice, Antitrust Div., to Gerrard R. Beeney, Esq. (June 26, 1997), *available at* http://www.justice.gov/atr/public/busreview/215742.htm. In that letter, the Department of Justice stated that it was not then presently inclined to initiate antitrust enforcement against the MPEG-2 patent pool because:

> [T]he proposed agreements that will govern the licensing arrangement have features designed to enhance the usual procompetitive effects and mitigate potential anticompetitive dangers. The limitation of the Portfolio to technically essential patents and the use of an independent expert to be the arbiter of that limitation reduces the risk that the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

| Case No. | LA CV14-05150 JAK (AJWx) | Date | February 5, 2015 |
|---|---|---|---|
| Title | Zenith Electronics, LLC, et al. v. Sceptre, Inc. | | |

>     patent pool will be used to eliminate rivalry between potentially competing technologies.
>     Potential licensees will be aided by the provision of a clear list of the Portfolio patents, the
>     availability of the Portfolio patents independent of the Portfolio, and the warning that the
>     Portfolio may not contain all Essential Patents. The conditioning of licensee royalty liability
>     on actual use of the Portfolio patents, the clearly stated freedom of licensees to develop
>     and use alternative technologies, and the imposition of obligations on licensees' own
>     patent rights that do not vitiate licensees' incentives to innovate, all serve to protect
>     competition in the development and use of both improvements on, and alternatives to,
>     MPEG-2 technology.

*Id.*

MPEG LA did not obtain such a letter for the ATSC pool. It is unclear whether the Department of Justice has examined either the present workings of the MPEG-2 patent pool or any aspect of the ATSC patent pool.

### III.   ANALYSIS

#### A.   Legal Standard

##### 1.   Motion to Dismiss

Fed. R. Civ. P. 8(a) provides that a "pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." The complaint must state facts sufficient to show that a claim for relief is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The complaint need not include detailed factual allegations, but must provide more than a "formulaic recitation of the elements of a cause of action." *Id.* at 555. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).

A party may move to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). Dismissal is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support one. *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). In considering a motion to dismiss, the allegations in the challenged complaint are deemed true and must be construed in the light most favorable to the non-moving party. *Cahill v. Liberty Mut. Ins. Co.,* 80 F.3d 336, 337-38 (9th Cir. 1996). However, a court need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit. Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis Sec. Litig.* 536 F.3d 1049, 1055 (9th Cir. 2008) (citing *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-05150 JAK (AJWx) | Date | February 5, 2015 |
|---|---|---|---|
| Title | Zenith Electronics, LLC, et al. v. Sceptre, Inc. | | |

Fraud allegations are "properly subject to Rule 9(b) in every case," state or federal. *Vess v. Ciba-Geigy Corp. USA,* 317 F.3d 1097, 1104 (9th Cir. 2003). If fraud is a necessary element of a state law claim, the entire claim must be pleaded with the particularity required by Rule 9(b). *See id.* at 1103-4. Fed. R. Civ. P. 9(b) requires parties alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake." The Rule allows "[m]alice, intent, knowledge, and other conditions of a person's mind" to be "alleged generally." *Id.* The purpose of Rule 9(b) is threefold: (1) to give notice to defendants; (2) to deter pretextual filings; and (3) to "prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis." *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001) (quoting *In re Stac Elec. Sec. Litig.,* 89 F.3d 1399, 1405 (9th Cir. 1996)).

"Fraud can be averred by specifically alleging fraud, or by alleging facts that necessarily constitute fraud (even if the word 'fraud' is not used)." *Vess*, 317 F.3d at 1105. In the present action, California law determines whether alleged acts are fraudulent in nature. *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1126-27 (9th Cir. 2009). In *Engalla v. Permanente Med. Group, Inc.*, the California Supreme Court identified the elements of a fraud claim:

> The elements of fraud that will give rise to a tort action for deceit are: (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e. to induce reliance; (d) justifiable reliance; and (e) resulting damage.

15 Cal. 4th 951, 974 (1997) (internal quotation marks and citation omitted).

Allegations of fraud must be specific enough to give defendants notice of the particular misconduct that is alleged to constitute the fraud charged. This is required so that they can defend against the charge and not just deny any wrongdoing. *Vess*, 317 F.3d at 1106 (citation omitted). "While statements of the time, place and nature of the alleged fraudulent activities are sufficient, mere conclusory allegations of fraud are insufficient." *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989). "However, the rule may be relaxed as to matters within the opposing party's knowledge. For example, in cases of corporate fraud, plaintiffs will not have personal knowledge of all of the underlying facts." *Id.*

    **B.    Application**

In order to present the following discussion in the most coherent manner, the counterclaims are addressed in a sequence different from the order in which they are presented in the First Amended Counterclaims.

        1.    <u>The Fourth Counterclaim -- Breach of Contract (Against Plaintiffs)</u>

Defendant alleges that, because the Plaintiffs promised "to license any essential patents for the ATSC Standard on FRAND terms," but failed to do so, each breached a promise which allegedly caused Defendant to incur damages. ACC, Dkt. 62 at ¶¶ 144, 146-47. In support of the Motion, Counterclaim-Defendants argue: (1) because Defendant never sought a license, it cannot allege a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

| Case No. | LA CV14-05150 JAK (AJWx) | Date | February 5, 2015 |
|---|---|---|---|
| Title | Zenith Electronics, LLC, et al. v. Sceptre, Inc. | | |

breach of an obligation to license on FRAND terms; and (2) Defendant does not allege that the patents-in-suit are in fact essential to the ATSC Standard, instead characterizing them as "purportedly" or "allegedly" essential. Mot., Dkt. 67-1 at 18-19.

As to whether Defendant pursued a license, in their Complaint, Plaintiffs have alleged that "MPEG LA offered the ATSC pool license to [Defendant] but [Defendant] has declined to take the license." Compl., Dkt. 1 at ¶ 27. Contrary to Defendant's interpretation of this allegation, Opp'n, Dkt. 72 at 21, refusing a pool license offered by MPEG LA is not the same as seeking directly from the three Plaintiffs a license for the four patents-in-suit. However, Defendant has alleged that it "attempted to negotiate license agreements with MPEG LA on FRAND terms," ACC, Dkt. 62 at ¶ 73, that the $5.00/unit pool license is not FRAND, and that the pool license is the only license covering the patents-in-suit that Plaintiffs have offered. *See id.* at ¶ 62. Neither party has alleged that Plaintiffs offered standalone FRAND licenses to Defendant for the four patents-in-suit, or that Defendant specifically sought such licenses.

For these reasons, Defendant has adequately alleged that Plaintiffs breached their FRAND obligations, assuming that the patents-in-suit are, as Plaintiffs allege, essential to the ATSC Standard. *See Microsoft Corp. v. Motorola, Inc.*, 864 F. Supp. 2d 1023, 1038 (W.D. Wash. 2012) (holding that where a patentee agreed to negotiate licenses on FRAND terms, the language of the agreement did not require it to make offers on terms that were ultimately determined to be FRAND, but did require the offer to be in good faith in light of the FRAND commitment); *Microsoft Corp. v. Motorola, Inc.*, No. C 10-1823 JLR, 2013 WL 6000017, at *6 (W.D. Wash. Nov. 12, 2013) (after jury trial finding that patent owner breached its obligation to negotiate FRAND terms in good faith, entering final judgment of $14 million against patent owner).

As to the question of whether, as Plaintiffs have alleged, the patents-in-suit are actually essential to the ATSC Standard, Compl. at ¶ 16, Defendant contests infringement without denying that its products practice the ATSC Standard. Therefore, it appears that part of the defense in this case is a challenge to the claim that the patents-in-suit are in fact essential for practicing the standard. However, Fed. R. Civ. P. 8(d)(2) provides that "[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." *See PAE Gov't Servs., Inc. v. MPRI, Inc.*, 514 F.3d 856, 859 (9th Cir. 2007) ("we allow pleadings in the alternative -- even if the alternatives are mutually exclusive.").

Defendant also argues that the breach of contract counterclaim is barred by the four-year statute of limitations of Cal. Civ. Proc. Code. § 337(1). Mot., Dkt. 67-1 at 12. The premise of that argument is that MPEG LA set the ATSC pool license rate in 2007. *Id.* at 13. But it appears that neither Plaintiffs nor MPEG LA took any action towards obtaining royalties from Defendant until 2012. *See* ACC, Dkt. 62 at ¶¶ 80, 83. "The statute of limitations in a contract action, however, does not run before the breach of contract in question has occurred." *Mullins v. Rockwell Int'l. Corp.*, 15 Cal. 4th 731, 740-41 (1997). Here, there could be no breach as to Defendant until Plaintiffs failed to comply with their FRAND commitment as to Defendant. Thus, for purposes of the Motion, Defendant's allegations adequately state a claim within the statute of limitations for breach of contract.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-05150 JAK (AJWx) | Date | February 5, 2015 |
|---|---|---|---|
| Title | Zenith Electronics, LLC, et al. v. Sceptre, Inc. | | |

For these reasons, the Motion is DENIED as to the fourth counterclaim, for breach of contract.

    2.    <u>The Fifth Counterclaim -- Promissory Estoppel (Against Plaintiffs)</u>

The promissory estoppel counterclaim is grounded in the same facts as the breach of contract claim. For this reason, Counterclaim-Defendants argue that it fails due to the deficiencies identified in the breach of contract counterclaim. Mot., Dkt. 67-1 at 20. Promissory estoppel requires the following: (1) a clear promise; (2) reliance; (3) reasonableness and foreseeability of reliance; and (4) injury. *Id.* at 19-20 (quoting *Press Rentals Inc. v. Genesis Fluid Solutions Ltd.*, No. CV 5:11-02579 EJD, 2012 WL 3791449, at *5 (N.D. Cal. Aug. 31, 2012)). Under these standards and for the reasons stated above with respect to the Fourth Counterclaim, the claim for promissory estoppel is adequately stated.

In a parallel to its position as to the Fourth Counterclaim, Defendant argues that the promissory estoppel counterclaim is barred by the two-year statute of limitations of Cal. Civ. Proc. Code § 339. Mot., Dkt. 67-1 at 12. Here, it is alleged that "[i]n or about the Summer of 2012, MPEG LA and/ or Plaintiffs sent letters to some of Sceptre's most important customers with the express, admitted intention of causing those customers to stop doing business with Sceptre." ACC, Dkt. 62 at ¶ 80. The Counterclaims in this case were first filed on September 8, 2014. Therefore, the challenged conduct could have taken place more than two years before the Counterclaims were filed. However, subsequent independent acts may also have given rise to a claim for promissory estoppel. *See* Dkt. 38. Because there are sufficient allegations to support this theory, its merits cannot be resolved on a motion to dismiss. This is particularly so given the overlap between this and the breach of contract claim.

For these reasons, the Motion is therefore DENIED as to the fifth counterclaim, for promissory estoppel.

    3.    <u>The First Counterclaim -- Sherman Act § 2 Monopolization (Against Plaintiffs)</u>

This claim is based on an alleged monopolization of the "upstream" market for ATSC Standard essential technology, and is not based on monopoly leveraging or attempted monopolization of the downstream product market. Mot., Dkt. 67-1 at 14-15 (citing ACC, Dkt. 62 at ¶¶ 6, 98). Defendant argues that Plaintiffs unlawfully acquired monopoly power in the ATSC Standard essential technology market by making false promises to the ATSC and the FCC to license patents on a FRAND basis. *Id.* at 23 (citing ACC, Dkt. 62 at ¶¶ 3, 144-46).

There are three components that must be established to prevail on a claim of monopolization: "(1) possession of monopoly power in the relevant market; (2) willful acquisition or maintenance of that power; and (3) causal antitrust injury." *L.A. Land Co. v. Brunswick Corp.*, 6 F.3d 1422, 1425 (9th Cir. 1993). Monopoly power is the ability to "control prices or exclude competition" in a given market. *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) (quoting *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956)). "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). "A standard, by definition, eliminates alternative technologies." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 314 (3d. Cir. 2007) (citing *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 559, 571 (1982) ("'[A] standard-setting

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

| Case No. | LA CV14-05150 JAK (AJWx) | Date | February 5, 2015 |
|---|---|---|---|
| Title | Zenith Electronics, LLC, et al. v. Sceptre, Inc. | | |

organization . . . can be rife with opportunities for anticompetitive activity.'')). Because standard "lock[ ] in" may permit a patentholder to demand supra-competitive royalties, "FRAND commitments become important safeguards against monopoly power." *Id.*

Although the monopoly granted by a patent is not itself of the type that the antitrust laws prohibit, the Third Circuit held "that (1) in a consensus-oriented private standard-setting environment, (2) a patent holder's intentionally false promise to license essential proprietary technology on FRAND terms, (3) coupled with a [standard setting organization]'s reliance on that promise when including the technology in a standard, and (4) the patent holder's subsequent breach of that promise, is actionable anticompetitive conduct." *Broadcom*, 501 F.3d at 314.[1] In *Broadcom*, the relevant market was that for Qualcomm's proprietary WCDMA technology. This technology was essential to the implementation of the UMTS standard, and was not interchangeable with other technologies because adherents to the UMTS standard had become locked into it. *Id.* at 315.

In holding that Broadcom's complaint adequately alleged the required elements of the cause of action, the Third Circuit referred to allegations as to how Qualcomm obtained market power. Thus, it did so "when it secured, based on its FRAND commitments that it never intended to meet, the incorporation of WCDMA technology into wireless phone standards." This was a sufficient allegation because "the UMTS standard was adopted in reliance on Qualcomm's false promise to license its 'essential' patents on FRAND terms," and "Qualcomm has never had any intention of applying a reasonable royalty rate." *Id.* at 315 (citing *Broadcom Corp. v. Qualcomm Inc.*, No. CV 05-3350, First Amended Compl. at ¶¶ 82, 99 (Sept. 19, 2005)). Finally, although Defendant only alleges generally that Plaintiff's FRAND promises were false, Fed. R. Civ. P. 9(b) allows "intent . . . and other conditions of a person's mind" to be alleged generally.

Counterclaim-Defendants also raise standing and statute of limitations arguments in support of the Motion. Mot., Dkt. 67-1 at 10-13. Neither is persuasive. As to standing, the alleged injury is sufficiently "concrete, particularized, and actual or imminent," as required for Article III standing generally. *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (citation omitted). Further, it is "injury of the type the antitrust laws were intended to prevent." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*, 190 F.3d 1051, 1055 (9th Cir. 1999). Defendant has sufficiently alleged that, as a result of their false promises to the FCC and the resulting monopolization of essential intellectual property rights for the ATSC standard,

---

[1] *Rambus, Inc. v. FTC,* 522 F.3d 456 (D.C. Cir. 2008) overturned an FTC order finding that Rambus engaged in unlawful monopolization arising out of its failure to disclose its patents to the standard-setting body. *Id.* at 462. There, the FTC "found the consequences of such nondisclosure only in the alternative: that it prevented [the standard setting organization] either from adopting a non-proprietary standard, *or* from extracting a RAND commitment from Rambus when standardizing its technology." *Id.* (emphasis omitted). The procedural posture and facts in the present action are more akin to those presented in *Broadcom* than *Rambus.* Like this case, *Broadcom* involved a motion to dismiss, rather than a review of a merits determination. And, like this case, the patent holder in *Broadcom* actually made a FRAND commitment. This had not occurred in *Rambus.* There it was alleged that the patent holder wrongfully evaded making such a commitment, Consequently, the D.C. Circuit expressed "serious concerns about strength of the evidence relied on to support some of the Commission's crucial findings regarding the scope of [the standard setting organization's] patent disclosure policies and Rambus's alleged violation of those policies." *Id.* at 467.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

| Case No. | LA CV14-05150 JAK (AJWx) | | Date | February 5, 2015 |
|---|---|---|---|---|
| Title | Zenith Electronics, LLC, et al. v. Sceptre, Inc. | | | |

Counterclaim-Defendants have been able to, and have, sought supra-competitive royalties, caused certain of Defendant's customers to stop doing business with it, and imposed the costs of defending this lawsuit without first offering a FRAND license.[2]  ACC, Dkt. 62 at ¶¶ 80-85.[3]

As to the statute of limitations issues, the claim was brought well within the four-year period from the first alleged act by the Counterclaim-Defendants to extract the claimed supra-competitive royalty from Defendant.[4]  *See Samsung Elecs. Co., Ltd. v. Panasonic Corp.*, 747 F.3d 1199 (9th Cir. 2014) (adoption of a new license and an attempt to collect royalty payments under that license was each an independent overt act that triggered the statute of limitations). "A cause of action in antitrust accrues each time a plaintiff is injured by an act of the defendant and the statute of limitations runs from the commission of the act." *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir. 1987) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971)) ("We hold that where the alleged antitrust violation is the attempted enforcement of an illegal contract through judicial process, the initiation of judicial proceedings is the last overt act for purposes of the statute of limitations.")

For these reasons, the Motion is DENIED as to the first counterclaim for monopolization brought pursuant to § 2 of the Sherman Act.

    4.  <u>The Second Counterclaim -- Sherman Act § 2 Conspiracy to Monopolize (Against Plaintiffs and MPEG LA)</u>

Defendant's Sherman Act § 2 conspiracy to monopolize claim differs from its monopolization claim. The latter focuses on the Plaintiffs' individual monopoly power obtained through intentionally false FRAND

---

[2] Non-sham and objectively reasonable lawsuits are generally protected petitioning activity, and cannot alone constitute an antitrust violation under the Noerr-Pennington doctrine. *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965); *see also Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, (1993). However, "otherwise protected litigation can be a part of an 'anticompetitive scheme' claim" if the court finds that "the other aspects of the scheme independently produce anticompetitive harms." *Hynix Semiconductor Inc. v. Rambus, Inc.*, 527 F. Supp. 2d 1084, 1097 (N.D. Cal. 2007) (discussing the tension between a patentee's freedom to bring suit and the ability to obtain redress for schemes to violate the antitrust laws).

[3] Counterclaim-Defendants also challenge the counterclaim on the ground that Defendant does not know what the patent owners would charge for licenses to their individual ATSC patents because Defendant has chosen not to negotiate with them. They add that "[t]he burden of proving lack of a realistic opportunity to license directly cannot be met where a plaintiff never makes an inquiry or attempts to negotiate a single individual license." Reply, Dkt. 76 at 10 (citing *Nero AG v. MPEG LA, L.L.C.*, No. CV 10-3672 MRP, 2010 WL 4878835, at *2 (C.D. Cal. Nov., 24, 2010)). However, *Nero* did not apply a theory of monopolization through false promises to a standard-setting organization. Rather, there were different theories pursued there than those that underlie the present counterclaims. Thus, even if *Nero* were binding precedent, it would not control the outcome here.

[4] Counterclaim-Defendants argue that "[t]he present lawsuit is merely the reaffirmation of the [Defendant's] demand for royalty payments for their respective ATSC patents (an original act that was done in 2007)." Reply, Dkt. 76 at 6. However, Counterclaim-Defendants nowhere describe any efforts they undertook to seek royalty payments from Defendant in 2007.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

| Case No. | LA CV14-05150 JAK (AJWx) | Date | February 5, 2015 |
|---|---|---|---|
| Title | Zenith Electronics, LLC, et al. v. Sceptre, Inc. | | |

promises in connection with standard setting; the former focuses on the Plaintiffs' later agreement to pool and license their standard essential patents on non-FRAND terms. ACC, Dkt. 62 at ¶128. Thus, the claim is brought against both MPEG LA and Plaintiffs.

"The offense of conspiracy to monopolize has four elements: (1) the existence of a conspiracy; (2) an overt act in furtherance of the conspiracy; (3) the specific intent to monopolize; and (4) causal antitrust injury." Mot., Dkt. 67-1 at 16 (citing *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003)). Counterclaim-Defendants argue that the conspiracy counterclaim fails because it seeks to allege a "shared" monopoly among all three of the Patent Owners. They argue that this theory is inconsistent with the holdings that require a party alleging conspiracy under § 2 to show specific intent to empower a single entity with monopoly power. Mot., Dkt. 67-1 at 17 (citing *Standfacts Credit Servs., Inc. v. Experian Info. Solutions, Inc.*, 405 F. Supp. 2d 1141, 1152-53 (C.D. Cal. 2005); *Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co.*, 926 F. Supp. 2d 36, 45-46 (D.D.C. 2013)).

Counterclaim-Defendants also cite the statement in Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 810g (3d ed. 2008) that "courts and the Federal Trade Commission have *universally rejected* claims that § 2 condemns 'shared' monopoly." *Id.* (emphasis Counterclaim-Defendants'). However, the Areeda treatise goes on to explain that:

> [t]hese cases have thus rejected challenges to [claims about] (a) the unilateral conduct of a firm too small to meet orthodox market share requirements but where monopoly-like results are achieved by rivals' acquiescence or tacit participation in the defendant's policies; or (b) exclusionary practices allegedly orchestrated by a group of firms in the absence of sufficient evidence of an "agreement" among those firms to evoke § 1.

As this passage shows, the cases described in the treatise differ from this one, in which Defendant alleges an express agreement among a group of firms, as discussed in connection with the § 1 claim. Defendant also argues that the Supreme Court, in *American Tobacco Co. v. United States*, upheld a conviction under § 2 for group conspiracy to exclude competitors "provided they also have such a power that they are able, as a group, to exclude actual or potential competition from the field and provided that they have the intent and purpose to exercise that power," without any showing that power was to be concentrated in a single firm. Opp'n, Dkt. 72 at 19-20 (quoting 328 U.S. 781, 809 (1946)).[5]

The § 2 conspiracy to monopolize theory must be distinct from the § 2 monopolization theory. Thus, the allegation that each of the Plaintiffs wrongfully acquired monopoly power through false FRAND promises does not necessarily show that Plaintiffs conspired to achieve that end or some other improper purpose. As Defendant itself argues in connection with the § 2 monopolization claim, the core of the alleged monopolization theory is what resulted from the standard-setting process. Each holder of a standard essential patent could extract a royalty from every market participant who had become locked into the

---

[5] Counterclaim-Defendants argue that, in *American Tobacco*, a "'shared monopoly' theory was unnecessary . . . because each defendant enjoyed 'marked dominance,'" and each was individually convicted of monopolization. Reply, Dkt. 76 at 8. However, because the Defendants in *American Tobacco* were in the same market, a theory of shared monopolization is consistent with its facts.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

# CIVIL MINUTES – GENERAL

| Case No. | LA CV14-05150 JAK (AJWx) | Date | February 5, 2015 |
|---|---|---|---|
| Title | Zenith Electronics, LLC, et al. v. Sceptre, Inc. | | |

standard. Thus, in stating its § 2 claim for the post-standard-setting conduct, Defendant alleges that, after the standard was set, "Plaintiffs and MPEG LA then expressly conspired and agreed . . . to pool and license their alleged standard essential patents on non-FRAND terms to unlawfully acquire or maintain monopoly power." ACC, Dkt. 62 at ¶128. It is not clear that, by pooling their patents, Plaintiffs would gain any monopoly power greater or different from what they obtained as a result of the standard-setting process. However, it is plausible that the agreement to pool and license their patents on non-FRAND terms was a mechanism to maintain that power by enhancing their ability to exploit the allegedly improperly obtained monopolies.

Finally, for the same reasons previously discussed, the allegations suffice to show that the counterclaim is not barred by defects in standing or that it is barred by the controlling statute of limitations.

For these reasons, the Motion is DENIED as to the second counterclaim for conspiracy to monopolize.

        5.       <u>The Third Counterclaim -- Sherman Act § 1 Concerted Action Unreasonably Restraining Trade (Against Plaintiffs and MPEG LA)</u>

Defendant alleges that MPEG LA and the Plaintiffs have agreed "not to compete on pricing for the royalty rate for the ATSC patent pool," and "to set a non-FRAND royalty rate for the pooled patents." ACC, Dkt. 62 at ¶ 137. Defendant alleges that Counterclaim-Defendants engaged in additional violations of § 1 by demanding royalties for products sold outside the statute of limitations period, demanding royalties for products for which royalties have already been paid, using high royalty demands to eliminate lower price-tier competition, demanding royalties for non-U.S. patents, sending letters to Defendant's customers, and failing to ensure that the ATSC pool patents are actually essential to the ATSC Standard. ACC, Dkt. 62 at ¶¶ 137-38.

Counterclaim-Defendants argue that a Sherman Act claim does not arise "where the business practice being challenged involves the core activity of the joint venture itself -- namely, the pricing of the very goods produced." Mot., Dkt. 67-1 at 17-18 (quoting *Texaco Inc. v. Dagher*, 547 U.S. 1, 7-8 (2006)). This position is not persuasive. *Texaco* held that, although such price setting is not a *per se* violation of § 1, this type of arrangement may be subject to attack under the rule of reason. *Texaco*, 547 U.S. at 7. Counterclaim-Defendants also cite the statement in *Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.* that "[j]oint ventures and other cooperative arrangements are . . . not usually unlawful, at least not as price-fixing schemes, where the agreement on price is necessary to market the product at all." Mot., Dkt. 67-1 at 18 (quoting 441 U.S. 1, 23 (1979)). However, as in *Texaco*, the Court in *Broadcast Music* held only that such arrangements are not *per se* illegal, but instead should be "subjected to a more discriminating examination under the rule of reason." 441 U.S. at 24.

Counterclaim-Defendants next argue that Defendant failed to plead the facts underlying the counterclaim with adequate particularity. Mot., Dkt. 67-1 at 22. However, Defendant specifically pleaded the following: details of the development and adoption of the ATSC Standard (ACC, Dkt. 62 at ¶¶ 30-36); the FRAND requirement imposed on the participants and Plaintiffs' specific FRAND agreements (ACC, Dkt. 62 at ¶¶ 37- 46); that some of Zenith's previous licenses of its ATSC patents were not FRAND (ACC, Dkt. 62 at ¶¶ 50-55); the formation of the ATSC patent pool and discussions about the rate it would charge, including

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

| | | | |
|---|---|---|---|
| Case No. | LA CV14-05150 JAK (AJWx) | Date | February 5, 2015 |
| Title | Zenith Electronics, LLC, et al. v. Sceptre, Inc. | | |

specific discussion among the pool members of potential antitrust problems of a high royalty rate and tying of non-essential patents to essential patents (ACC, Dkt. 62 at ¶¶ 57-66); that non-essential patents, including expired and foreign patents, are tied to the essential patents in the ATSC pool (ACC, Dkt. 62 at ¶¶ 67-70), and that MPEG LA sent letters to Defendant's customers with the intent of persuading them not to do business with Defendant because it had not taken an ATSC pool license (ACC, Dkt. 62 at ¶¶ 80-85).

Finally, for the same reasons previously discussed, the allegations are sufficient to show that the counterclaim is not barred by defects in standing or by the controlling statute of limitations.

For these reasons, the Motion is DENIED as to the third counterclaim, concerted action unreasonably restraining trade, against all Counterclaim-Defendants.

      6.    <u>The Sixth Counterclaim -- Unfair Business Practices Under § 17200 -- Against Plaintiffs and MPEG LA)</u>

The parties agree that the § 17200 claim stands or falls with the antitrust claims. Mot., Dkt. 67-1 at 20, Opp'n, Dkt. 72 at 22. Thus, for the same reasons discussed above, the Motion is DENIED as to the sixth counterclaim, against all Counterclaim-Defendants, for unfair business practices under § 17200.

### IV.    <u>CONCLUSION</u>

For the foregoing reasons, the Motion is DENIED.

**IT IS SO ORDERED.**

                                                    :

Initials of Preparer    Ak