Colin G. Cabral (State Bar No. 296913)
ccabral@proskauer.com
Susan L. Gutierrez  (State Bar No. 273980)
sgutierrez@proskauer.com
PROSKAUER ROSE LLP
2049 Century Park East, 32nd Floor
Los Angeles, California 90067-3206
Telephone:(310) 557-2900
Facsimile: (310) 557-2193

Steven M. Bauer (admitted *pro hac vice*)
sbauer@proskauer.com
Justin J. Daniels (admitted *pro hac vice*)
jdaniels@proskauer.com
Safraz W. Ishmael (admitted *pro hac vice*)
sishmael@proskauer.com
William D. Dalsen (admitted *pro hac vice*)
wdalsen@proskauer.com
PROSKAUER ROSE LLP
One International Place
Boston, Massachusetts 02110
Telephone: (617) 526-9600

Baldassare Vinti (admitted *pro hac vice*)
bvinti@proskauer.com
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
Telephone:  (212) 969-3000

Christopher Ondeck (admitted *pro hac vice*)
condeck@proskauer.com
PROSKAUER ROSE LLP
1001 Pennsylvania Avenue
Washington, DC 20004
Telephone:  (202) 416-5865

*Attorneys for Counterclaim-Defendants*

**REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL**

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ZENITH ELECTRONICS LLC, PANASONIC CORPORATION, and U.S. PHILIPS CORPORATION,<br><br>Plaintiffs,<br><br>vs.<br><br>SCEPTRE, INC.,<br><br>Defendant.<br><br>AND RELATED COUNTERCLAIMS. | Case No. LA CV14-05150 JAK (AJWx)<br><br>Hon. John A. Kronstadt<br><br>**COUNTERCLAIM-DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION TO EXCLUDE SELECTED OPINIONS OF DR. MICHAEL A. WILLIAMS**<br><br>Date: February 8, 2016<br>Time: 8:30 am<br>Courtroom: 750 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................... 1

LEGAL STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY ......... 3

ARGUMENT ........................................................................................... 4

    I.    Dr. Williams Offers No Admissible Opinions About Any Relevant Downstream Market. ............................................... 4

    II.    Dr. Williams' Opinions About the Upstream Market Are Unreliable, Are Not Based on Reliable Methods, and Do Not Fit the Facts of this Case. .................................................... 7

        A.    Dr. Williams Did Not Analyze Competition in the Upstream Market. ................................................... 8

        B.    Dr. Williams' Tests of Monopoly Power Are Unreliable. ........ 15

    III.    Dr. Williams' Opinions As to Alleged Injury to Sceptre Are Inadmissible. ...................................................... 21

CONCLUSION ....................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abarca v. Merck & Co.*,
No. 1:07cv0388 OWW DLB, 2010 WL 4643642 (E.D. Cal. Nov. 9, 2010) ............................................................................................... 23

*AFMS LLC v. United Parcel Service Co., FedEx Corp.*,
Case No. CV 10-5830, slip op. (C.D. Cal. Feb. 4, 2014) .............................. 17, 18

*Beyene v. Coleman Sec. Servs., Inc.*,
854 F.2d 1179 (9th Cir. 1988) ......................................................................... 4

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) .................................................................................. 16, 18

*Champagne Metals v. Ken-Mac Metals, Inc.*,
458 F.3d 1073 (10th Cir. 2006) .................................................................... 22

*Concord Boat Corp. v. Brunswick Corp.*,
207 F.3d 1039 (8th Cir. 2000) ...................................................................... 23

*Corey Airport Services, Inc. v. City of Atlanta*,
632 F. Supp. 2d 1246 (N.D. Ga. 2008), *rev'd on other grounds*, 587 F.3d 1280 (11th Cir. 2009) .......................................................................... 11

*Daubert v. Merrell Dow Pharms. Inc.*,
509 U.S. 579 (1993) ...........................................................................*passim*

*Domingo v. T.K., M.D.*,
289 F.3d 600 (9th Cir. 2002) .......................................................................... 4

*Estate of Gonzalez v. Hickman*,
No. ED CV 05-660 MMM, 2007 WL 3237727 (C.D. Cal May 30, 2007) .............................................................................................................. 22

*General Elec. v. Joiner*,
522 U.S. 136 (1997) ...................................................................................... 23

*In re Fresh Del Monte Pineapples Antitrust Litig.*,
No. 04-md-1628(RMB)(MHD), 2009 WL 3241401 (S.D.N.Y. Sept. 30, 2009) ........................................................................................................ 18

ii

*In re Live Concert Antitrust Litig.*,
    863 F. Supp. 2d 966 (C.D. Cal. 2012) ...................................................... 16, 17, 18

*In re Southeastern Milk Antitrust Litig.*,
    No. 2:08–MD–1000, 2010 WL 8228835 (E.D. Tenn. 2010) ............................ 9, 10

*In re TMI Litig. Cases Consol. II*,
    911 F. Supp. 775 (M.D. Pa. 1996) ...................................................... 19

*Kentucky Speedway, LLC v. NASCAR, Inc.*,
    588 F.3d 908 (6th Cir. 2009) ...................................................... 18

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999) ...................................................... 3, 16, 23

*McLaughlin Equip. Co. v. Servaas*,
    No. IP-0127-C-T/K, 2004 WL 1629603 (S.D. Ind. Feb. 18, 2004) ...................... 19

*Mukhtar v. California State Univ., Hayward*,
    299 F.3d 1053 (9th Cir. 2002) ...................................................... 4

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ...................................................... 9

*St. Paul Fire and Marine Ins. Co. v. Nolen Group, Inc.*,
    No. Civ. A. 02-8601, 2005 WL 1168380 (E.D. Pa. May 13, 2005) .................... 24

*Therasense, Inc. v. Becton, Dickinson & Co.*,
    No. C 04-02123 WHA, 2008 WL 2323856 (N.D. Cal. May 22, 2008) ...................................................... 21

*TYR Sport, Inc. v. Warnaco Swimwear, Inc.*,
    709 F. Supp. 2d 821 (C.D. Cal. 2010) ...................................................... 15

*U.S. Horticultural Supply, Inc. v. Scotts Co.*,
    No. 04-5182, 2009 WL 89692 (E.D. Pa. Jan. 13, 2009) ...................................... 11

*Virginia Vermiculite Ltd. v. W.R. Grace & Co*,
    98 F. Supp. 2d 729 (W.D. Va. 2000) ...................................................... 11

*Western Parcel Express v. United Parcel Services of Am., Inc.*,
    65 F. Supp. 2d 1052 (N.D. Cal. 1998) ...................................................... 22

iii

**OTHER AUTHORITIES**

Fed. R. Civ. P. 26.................................................................................................. 1

Federal Rule of Evidence 702 ............................................................*passim*

MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE DR. WILLIAMS' TESTIMONY

1    Plaintiffs Zenith Electronics, LLC ("Zenith"), Panasonic Corporation
2 ("Panasonic"), and U.S. Philips Corporation ("Philips") (collectively, "Plaintiffs"),
3 together with Counterclaim-Defendant MPEG LA, LLC ("MPEG LA")
4 (collectively, "Counterclaim-Defendants"), in connection with their Motion for
5 Partial Summary Judgment (Dkt. No. 260), hereby move to exclude selected
6 opinions and testimony of Sceptre Inc.'s proffered expert, Dr. Michael A. Williams.

7                              **INTRODUCTION**

8    Sceptre has asserted six non-patent Counterclaims against Counterclaim-
9 Defendants.[1]  In support of those Counterclaims, Sceptre has proffered the report
10 and testimony of Dr. Williams.  On October 9, 2015, Dr. Williams submitted a
11 report pursuant to Fed. R. Civ. P. 26 disclosing all of his opinions related to the
12 Counterclaims and the bases for those opinions.  (Declaration of Christopher E.
13 Ondeck ("Ondeck Decl."), Ex. A [Expert Report of Michael A. Williams, Ph.D.],
14 (hereinafter the "Williams Report")).  On October 30, 2015, Defendants submitted
15 the report of Dr. Anne Layne-Farrar, which responded to and addressed the
16 methods, opinions, and underlying analyses proffered by Dr. Williams in the
17 Williams Report.  (Declaration of Anne Layne-Farrar ("Layne-Farrar Decl."), Ex. A
18 [October 30, 2015 Expert Rebuttal Report] (hereinafter the "Layne-Farrar Report")).
19 Dr. Williams was deposed on November 9, 2015, and Dr. Layne-Farrar was deposed
20 on November 12-13, 2015.  (*See generally* Ondeck Decl. Ex. B [Dr. Michael A.
21 Williams 11/9/15 Dep. Tr.] (hereinafter "Williams Dep.").)

22    _____

23 [1] Sceptre alleges 14 counterclaims, including: (1) Sherman Act § 2 Monopolization
24 (against Plaintiffs); (2) Sherman Act § 2 Conspiracy to Monopolize (against
   Counterclaim-Defendants); (3) Sherman Act § 1 Concerted Action Unreasonably
25 Restraining Trade (against Counterclaim-Defendants); (4) Breach of Contract
   (against Plaintiffs); (5) Promissory Estoppel (against Plaintiffs); (6) Unfair Business
26 Practices Under § 17200 (against Counterclaim-Defendants); as well as various
27 declaratory judgment claims. *See generally* Sceptre, Inc.'s Second Amended
   Counterclaims, Dkt. No. 93 (Feb. 19, 2015) (hereinafter cited as "SAC").
28

Counterclaim-Defendants have moved for summary judgment on Sceptre's non-patent Counterclaims, and, as outlined in more detail in their moving papers, have demonstrated the inherent legal and economic weaknesses in Dr. Williams' opinions.  Counterclaim-Defendants move separately here, however, to have certain of Dr. Williams' opinions excluded under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993).  Though the Court does not have to strike any of Dr. Williams' opinions in order to grant Counterclaim-Defendants' Motion for Partial Summary Judgment, Sections IV and V of Dr. Williams' report are so flawed that exclusion of the opinions contained in those sections (as well as any testimony by Dr. Williams about those topics) is appropriate under Rule 702.

In Section IV of his report, Dr. Williams purports to have analyzed the "████████████" of the royalty rate charged by MPEG LA for portfolio licenses to the ATSC patent pool.  (Williams Report ¶¶ 6, 73-94.)  In Section V of his report, Dr. Williams purports to "███████████████████" (*Id.* ¶¶ 6, 95-99.)  Sceptre seeks to rely on the discussion, analyses, and opinions in Sections IV and V of the Williams V in support of its non-patent Counterclaims and its attendant contentions that Counterclaim-Defendants' alleged conduct is anticompetitive, that Counterclaim-Defendants wielded monopoly power in the upstream technology market, that Counterclaim-Defendants' alleged conduct raises patent hold-up concerns, and that competition was supposedly harmed in the upstream technology market and in the alleged downstream product market.  Not only are these contentions unsupported by the evidentiary record in this case, the purported analyses and discussion of these topics by Dr. Williams fail to meet the standards set forth in Rule 702 and *Daubert*.

Consequently, Counterclaim-Defendants move the Court to exclude from the record on summary judgment, and at trial, any testimony or opinions presented by

2

1  Dr. Williams regarding the alleged antitrust markets and the economic effects in
2  those markets of Counterclaim-Defendants' alleged conduct (*i.e.*, Section IV of the
3  Williams Report) and the alleged injury to Sceptre (*i.e.*, Section V of the Williams
4  Report).  The opinions set out in those sections of the Williams Report:  (i) will not
5  help the trier of fact to understand the evidence or to determine a fact in issue; (ii)
6  are based on insufficient facts and data; (iii) are based on improperly applied and
7  unreliable methods; and (iv) have unreliably applied those methods to the facts of
8  this case.

9  **LEGAL STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY**

10  Federal Rule of Evidence 702 governs the admissibility of expert testimony,
11  providing that:

12  A witness who is qualified as an expert by knowledge, skill, experience,
13  training, or education may testify in the form of an opinion or otherwise if:
14  (a) the expert's scientific, technical, or other specialized knowledge will help
15  the trier of fact to understand the evidence or to determine a fact in issue; (b)
16  the testimony is based on sufficient facts or data; (c) the testimony is the
17  product of reliable principles and methods; **and** (d) the expert has reliably
18  applied the principles and methods to the facts of the case.

19  Fed. R. Evid. 702 (emphasis added); *see id.* Advisory Comm. Note (court may
20  consider whether expert has accounted for obvious alternative explanations in
21  determining whether expert testimony is reliable).  The court is charged with
22  "ensuring that an expert's testimony both rests on a reliable foundation and is
23  relevant to the task at hand." *Daubert*, 509 U.S. at 597.  The court must ensure "that
24  an expert, whether basing testimony upon professional studies or personal
25  experience, employs in the courtroom the same level of intellectual rigor that
26  characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v.*
27  *Carmichael*, 526 U.S. 137, 152 (1999).  In making a reliability determination, courts

28

MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE DR. WILLIAMS' TESTIMONY

"scrutinize not only the principles and methods used by the expert, but also whether those principles and methods have been properly applied to the facts of the case." Fed. R. Evid. 702 Advisory Comm. Note (2000).

"It is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment." *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988). "The trial court must act as a 'gatekeeper' . . . by making a preliminary determination" that the expert's testimony is "both relevant and reliable." *Mukhtar v. California State Univ., Hayward*, 299 F.3d 1053, 1063 (9th Cir. 2002) (expert testimony was wrongly admitted because trial court did not fulfill its gatekeeping role when it failed to determine whether testimony was reliable); *Domingo v. T.K., M.D.*, 289 F.3d 600, 605 (9th Cir. 2002) (trial court accomplishes its goal as gatekeeper "through a preliminary determination that the proffered [expert testimony] is both relevant and reliable").

The burden is placed on Sceptre, as the proponent of the expert testimony, to demonstrate that Dr. Williams' opinions and methods are reliable and admissible. *See Daubert*, 509 U.S. at 592; Fed. R. Evid. 702 Advisory Comm. Note (2000).

## ARGUMENT

## I.   **Dr. Williams Offers No Admissible Opinions About Any Relevant Downstream Market.**

Dr. Williams has proffered no opinions, nor conducted any economic analysis, regarding the supposed downstream market for DTVs in which Sceptre claims competition was harmed, and Dr. Williams admitted this in his deposition. (*See, e.g.*, Williams Dep. at 48:1-13 ("█████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

4

1 ████████████████████████████████████████████) There should

2 therefore be no dispute that Dr. Williams may not offer any opinions or testimony

3 about any relevant downstream market—including, but not limited to, market

4 definition, the cross-elasticity of demand of DTVs and monitors, consumer

5 preferences, market participants, barriers to entry, market shares, product prices,

6 output levels, and market entry/foreclosure.[2]

7     Dr. Williams' admissions are significant because the theory underlying

8 Sceptre's Counterclaims is that Counterclaim-Defendants' alleged misconduct

9 caused harm to competition in an alleged downstream market. (*See* SAC ¶¶ 96-106

10 ("The Downstream Product Market and the Effect of the Anticompetitive Conduct

11 Upon It"); *id.* ¶ 108 ("Plaintiffs and MPEG LA . . . have conspired in restraint of

12 trade to affect, raise, fix, maintain, and stabilize prices in the downstream product

13 market"); *id.* (asserting that the alleged misconduct "has in fact, restrained and

14 eliminated competition from Sceptre, as well as others in the downstream product

15 market"); *see also id.* ¶¶ 109, 112, 123-24, 138-39, 142-43.)  As Dr. Layne-Farrar

16 explains, Sceptre alleges two forms of injury:  (i) that DTV makers and distributors

17 are forced to charge higher prices to downstream consumers; and (ii) Sceptre's

18 litigation costs.  (*See* Layne-Farrar Report ¶ 12.)  Based on Dr. Williams' own

19 admissions and his failure to conduct any analysis related to any downstream

20 markets, Defendants seek exclusion under Fed. R. Evid. 702 of any opinions and

21 testimony by Dr. Williams related to any relevant downstream markets.

22     A proper economic analysis of Sceptre's asserted downstream market

23 definition and any economic effects in that market would require an appropriate

24 assessment of the evidence and facts in this case.  Dr. Williams did not conduct such

25 as assessment.  (*See, e.g.,* Williams Dep. 191:9-21 ("████████████████

26

27 ────────────────────

[2] Monitors are "video display units essentially identical to DTVs but for the inclusion of an ATSC tuner." (Layne-Farrar Report ¶ 19.)

28

5



”) (emphasis added).)  Dr. Layne-Farrar agrees that Dr. Williams “███████████████████” and does not consider that competition in the downstream market may have been enhanced by the conduct at issue in this case. (*See* Layne-Farrar Report ¶ 17 (“██████████████████████)

Dr. Williams may have intentionally avoided performing the required assessment because it would demonstrate that competition in any relevant downstream market was <u>not</u> harmed, and this material omission from his analysis renders his opinions unreliable.  *See* Fed. R. Evid. 702 Advisory Committee Note (court may consider whether expert has accounted for obvious alternative explanations in determining whether expert testimony is reliable).  (*Cf.* U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* (2010) *available at* http://1.usa.gov/1JFB0Ib [Ex. C to Counterclaim-Defendants' Request for Judicial Notice] (hereinafter “*Merger Guidelines*”) at 2 (noting that “the Agencies consider

MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE DR. WILLIAMS' TESTIMONY

evidence indicating that the merger may enhance competition").)  For instance, in the Department of Justice Business Review Letter on which Sceptre relies in asserting its Counterclaims, (SAC ¶ 67), an assessment of downstream markets revealed that the patent pool at issue in that matter <u>did not present anti-competitive concerns</u>.[3]

Therefore, because Dr. Williams admits that he has proffered no opinions, nor conducted any independent analysis, about any downstream market, any opinions he directly or indirectly seeks to proffer related in any way to downstream markets should be excluded under Fed. R. Evid. 702.[4]

## II.  <u>Dr. Williams' Opinions About the Upstream Market Are Unreliable, Are Not Based on Reliable Methods, and Do Not Fit the Facts of this Case.</u>

Dr. Williams' opinions in Section IV of the Williams Report purport to measure the economic effects in the upstream technology market of Counterclaim-Defendants' alleged conduct.  However, the analyses underlying Dr. Williams' opinions in Section IV suffer from a number of defects that individually and collectively are fatal to the admissibility of those opinions.  To be clear, Counterclaim-Defendants do not challenge the definition of the upstream technology market asserted by Sceptre and Dr. Williams.  Defendants also do not challenge—as a general matter—the reliability, if properly applied, of the

---

[3] (*See* Business Review Letter from Joel I. Klein, Acting Assistant Attorney General, Antitrust Division, U.S. Dep't of Justice, to Gerrard R. Beeney, Esq. (June 26, 1997), *available at* http://1.usa.gov/1OXq8bb [Ex. B to Counterclaim-Defendants' Request for Judicial Notice] (hereinafter the "DOJ MPEG-2 Letter") at 11 (refusing to commence an enforcement investigation into separate MPEG-2 patent pool administered by MPEG LA, concluding that "it appears highly unlikely that the royalty rate could be used during [the license term] as a device to coordinate the prices of downstream products.").)

[4] This would include opinions about the price of televisions (Williams Report ¶ 5), consumer preferences in downstream markets (*id.* ¶ 63-64), and DTV manufacturers' margins (*id.* ¶ 62).

hypothetical monopolist and natural experiment methodologies that Dr. Williams claims to have applied.  Dr. Williams' characterizations of his analyses as a hypothetical monopolist test and a natural experiment, respectively, are misleading because he either applied an inappropriate version of those tests or, at best, improperly applied the tests as described in the *Merger Guidelines* and the case law. In addition, Dr. Williams cannot reliably opine on Counterclaim-Defendants' alleged monopoly power or harm to competition in the upstream market because he did not independently analyze competition in that market.

### A. Dr. Williams Did Not Analyze Competition in the Upstream Market.

Dr. Williams did not independently analyze competition in the upstream technology market, and his opinions related to the economic effects of the alleged misconduct are therefore unreliable and inadmissible under Rule 702.

*First*, Dr. Williams fails to consider (or even acknowledge) that MPEG LA's portfolio license for ATSC patents competes against the licenses available from individual ATSC patent holders.  (*See* Ondeck Decl. Exs. C-E; Layne-Farrar Report ¶ 135.)  The ability of each ATSC patent holder to negotiate licenses and royalty rates for their respective patents, in competition with MPEG LA's portfolio license, is a well-recognized and effective safeguard against any potential anti-competitive concerns.  (*See, e.g.*, DOJ MPEG-2 Letter (independent availability of licenses from individual patent holders "is a valuable failsafe").)  The portfolio license and the licenses offered by ATSC patent holders compete against each other in the upstream technology market and act as constraints on the ability of individual patent holders or MPEG LA to impose supra-competitive prices on potential licensees.  (*See* Layne-Farrar Report ¶¶ 117, 135.)  This is therefore a constraint on the ability of any patent holders, individually or collectively, to wield any monopoly power.  Dr. Williams does not attempt to consider or measure this.

MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE DR. WILLIAMS' TESTIMONY

1    There is no dispute in this case that ███████████████████

2  ████████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████

5  ██████████   (Ondeck Decl. Exs. C-E.)   And, Dr. Williams does not point to any

6  evidence or allegation by Sceptre that any potential licensee, including Sceptre, was

7  foreclosed from obtaining licenses directly from any ATSC patent holder.

8  Therefore, Dr. Williams' opinions in Section IV of his report—which relate to

9  competition in the upstream technology market—are based on insufficient facts, are

10  the product of unreliable methods, and do not appropriately apply any reliable

11  method to the facts of this case.

12       *Second*, despite his claims to the contrary, Dr. Williams does not actually

13  analyze any "direct evidence" of Sceptre's alleged harm to competition in the

14  upstream market.  Dr. Williams conducts no analysis of price or output levels in the

15  upstream technology market.  (Williams Dep. 188:10-23.)  He therefore offers no

16  reliable opinions in support of Sceptre's allegation that competition was harmed.

17  *See Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).

18       In fact, the available evidence—which Dr. Williams ignored—confirms the

19  unreliability of his opinions and their disconnect from the facts of this case.  For

20  example, Dr. Williams failed to consider that the number of licensees of ATSC

21  patents has increased over the relevant time period.  (Layne-Farrar Report ¶¶ 65-69.)

22  Dr. Williams does not identify, nor attempt to analyze the attendant facts or data

23  related to, any licensee or potential licensee of ATSC patents other than Sceptre.

24  (*See generally* Williams Report.)  Such a glaring omission in his analysis is grounds

25  for exclusion of his testimony about any economic effects in the upstream

26  technology market.  *See, e.g., In re Southeastern Milk Antitrust Litig.*, No. 2:08–

27  MD–1000, 2010 WL 8228835, at *1, *3 (E.D. Tenn. 2010) (granting defendants'

28

9

1   motion to exclude expert testimony because expert failed to support his testimony

2   that defendant possessed monopoly power with evidence that defendant exercised

3   actual control over prices or was engaged in actual exclusion of competitors).

4         Stated differently, if Dr. Williams' theories were correct, the empirical

5   evidence and data would show an impact on the upstream technology marketplace.

6   Over time—from when the ATSC standard was first adopted by the FCC in 1996, or

7   even from when Sceptre entered the market in ███—there would be increased

8   concentration of manufacturers and sellers of DTVs, exits from the market, or

9   shrinking numbers of ATSC patent licensees.  Dr. Williams can point to no evidence

10  of any of these, and he makes no attempt to analyze the evidence.  In fact, the

11  empirical evidence demonstrates the exact opposite:  the numbers of manufacturers

12  and sellers of DTV grew, new participants entered the market, and the number of

13  ATSC patent licensees grew.  (*See* Layne-Farrar Report ¶¶ 65-72.)  As Dr. Layne-

14  Farrar explains in her report:

15  ████████████████████████████████████████████████

16  ████████████████████████████████████████████████

17  ████████████████████████████████████████████████

18  ████████████████████████████████████████████████

19  ████████████████████████████████████████████████

20  ████████████████████████████████████████████████

21  ████████████████████████████████████████████████

22  ████████████████████████████████████████████████

23  ████████████████████████████████████████████████

24  ████████████████████████████████████████████████

25  █████████████████████████████████████

26  (*Id.* ¶ 98; *see also id.* ¶ 94.)  So, not only does Dr. Williams fail to conduct any

27  analysis of the effect on prices or output in any market, he wholesale ignores

28

10

significant record evidence showing that Counterclaim-Defendants did not have or exercise monopoly power in the upstream technology market.  For the additional and independent reason that Dr. Williams does not properly analyze direct evidence of any economic effects in the upstream technology market, his opinions set forth in Section V are inadmissible under Rule 702 because they are based on insufficient facts and data, are the product of unreliable methods, and are disconnected from the facts of this case.

*Third*, Dr. Williams failed to properly consider, let alone conduct any analysis of, viable alternatives to licensing ATSC patents that are available to DTV sellers and manufacturers and that therefore preclude any monopoly power in the upstream market.  (*Id.* ¶¶ 105-112.)  This type of failure is routinely found by courts to be fatal to the admissibility of expert testimony.  *See, e.g.*, *Corey Airport Services, Inc. v. City of Atlanta*, 632 F. Supp. 2d 1246, 1290, 1294 (N.D. Ga. 2008), *rev'd on other grounds*, 587 F.3d 1280 (11th Cir. 2009) (holding expert testimony about harm to competition was deficient because the expert failed to consider reasonable substitutes, thereby inadequately defining the relevant market for airport advertising); *Virginia Vermiculite Ltd. v. W.R. Grace & Co*, 98 F. Supp. 2d 729, 737–38 (W.D. Va. 2000) (granting defendants' joint motion to exclude expert testimony about the relevant mining market because the expert failed to consider substitutability of vermiculite sizes as well as the substitutability of other products); *cf. U.S. Horticultural Supply, Inc. v. Scotts Co.*, No. 04-5182, 2009 WL 89692, at *20 (E.D. Pa. Jan. 13, 2009) ("An improperly defined product market will pervert the assessment of . . . market power.  Evidence of reasonable interchangeability, the touchstone of a product market analysis, requires consideration of price, use, and qualities. Reasonable interchangeability may also be demonstrated by cross-elasticity of demand between the product itself and substitutes for it.").

MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE DR. WILLIAMS' TESTIMONY

1    As explained in the preceding section, Dr. Williams admits that he did not

2  analyze or consider any relevant downstream product market.  The absence of any

3  regression analysis, economic modelling, cross-price elasticity analysis, or any

4  analysis at all is controlling here.  As Dr. Layne-Farrar explains:

5  

6  

7  

8  

9  

10  

11  

12  (Layne-Farrar Report ¶ 17.)

13    Dr. Williams himself explains that

14  

15  

16  (Williams Report ¶ 90; *cf. id.* ¶ 78

17  n.135)  (

18  )  Despite his discussion about its importance, Dr.

19  Williams completely fails to assess whether potential licensees of ATSC patents

20  have the option

21  

22  

23  

24  )  Instead, Dr. Williams concludes—in a footnote,

25  without any analysis of the downstream market, and solely based on his *ipse dixit*—

26  

27  

28  

MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE DR. WILLIAMS' TESTIMONY



1    that ████████████████████████████████████████████████████

2    ████████████████████████████████████" (Williams Report ¶ 88 n.148.)[5]

3        Dr.  Williams  ignores  record  evidence ████████████████████████

4    ████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████

9    ██████████████████████████ ████████████████████████████████

10   ████████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████████

18   ██████████████████████   Dr. Williams does not attempt to consider, discuss, or

19   analyze this evidence.

20       Further, Dr. Williams fails to conduct any analysis of Sceptre's switching

21   costs—or any ATSC patent licensees' switching costs, for that matter—despite

22   recognizing the importance of such analysis to assessing the existence of monopoly

23   power or any anti-competitive concerns. (*See* Williams Report ¶ 15) ████████

24   ████████████████████████████████████████████████████████████

25   ████████████████████████████████

26   ─────────────────────
     [5] As Dr. Layne-Farrar explains, ████████████████████

27   ████████████████████████████████████████████████████████████

28   ██████████████████████   (Layne-Farrar Report ¶ 35.)

13



Leaving aside that Sceptre started selling DTVs in ▮, after the ATSC standard was adopted in 1996, Dr. Williams conducts zero analysis of Sceptre's sunk costs or investments (if any) in selling DTVs. And, as discussed above, he makes no effort to consider or analyze the economics or feasibility of available alternatives to Sceptre and licensees. Dr. Williams even recognizes that "evaluation of competitive alternatives available to customers is *always* necessary at some point in the analysis." (*Id.* ¶ 73 n.131 (quoting *Merger Guidelines*) (emphasis added).) Dr. Williams even fails to consider that Sceptre had been producing monitors since at least ▮, and he ignores Sceptre's admission that ▮▮▮ Further, his failure to analyze switching costs in the upstream technology market here contradicts his recognition that ▮▮. (*Id.* ¶¶ 15, 32, 36-37.)

In short, Dr. Williams conducts no analysis of the downstream product market, of the feasibility or availability of any alternatives to licensing a portfolio of ATSC patents from MPEG LA, or of the switching costs to Sceptre or any licensee. Therefore, his opinions about the alleged economic effects, patent hold-up, and

14

MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE DR. WILLIAMS' TESTIMONY

monopoly power in the upstream technology market are based on insufficient facts, egregiously ignore the facts and evidence in this case, and are not the product of any reliable analysis.  (*See* Layne-Farrar Report ¶¶ 85-89.)  Therefore, the opinions set forth in Section IV of the Williams Report are inadmissible under Rule 702 for this reason alone.  *See TYR Sport, Inc. v. Warnaco Swimwear, Inc.*, 709 F. Supp. 2d 821, 834 (C.D. Cal. 2010) ("The Court also finds that [the expert's] report should be excluded under Federal Rule of Evidence 702 as unreliable and not based on sufficient facts or data.  By not considering any data on the pricing, sales volume, or market share of manufacturers other than Speedo and TYR, [the expert] simply cannot make a reliable analysis as to market impact. The report is therefore irrelevant to the issue of market impact.").

Each of the foregoing defects in Dr. Williams' analysis of the upstream technology market renders his opinions in Section IV of his report inadmissible under Rule 702 and *Daubert*.

B. <u>Dr. Williams' Tests of Monopoly Power Are Unreliable.</u>

Dr. Williams' purported hypothetical monopolist test (including the attendant SSNIP test), and his purported natural experiment analysis are inadmissible pursuant to Rule 702 because they are not reliable applications of the methodologies they purport to apply.

*Hypothetical Monopolist Test*.  Dr. Williams did not properly conduct a hypothetical monopolist test, and therefore his opinions as to monopoly power are not admissible for this additional, independent reason.  Such a test "requires that a hypothetical profit-maximizing firm, not subject to price regulation, that was the only present and future seller of those products ('hypothetical monopolist') likely would impose at least a small but significant and non-transitory increase in price ('SSNIP') on at least one product in the market, including at least one product sold by one of the merging firms."  (*Merger Guidelines* at 9.)  Dr. Williams claims to

MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE DR. WILLIAMS' TESTIMONY

have performed a SSNIP test, but has not done so.[6]  Instead, Dr. Williams merely affixed antitrust labels to a cursory and conclusory analysis that is nothing more than his own inappropriate and economically insignificant version of a SSNIP test. That is insufficient under Rule 702 and *Daubert* as it lacks sufficient "intellectual rigor" to be considered reliable or scientific. *Kumho Tire*, 526 U.S. at 152.

Similar deficiencies precluded plaintiffs' expert testimony on market issues in *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966 (C.D. Cal. 2012), which is instructive here.  There, plaintiffs alleged that defendants engaged in anticompetitive activity in their promotion of live music concerts, resulting in supracompetitive ticket pricing.  *Id.* at 969.  Defendants challenged plaintiffs' expert, Dr. Owen Phillips, who opined that the relevant product market was comprised of "live rock music concerts."  *Id.* at 983.  The court agreed with defendants and excluded Dr. Phillips' opinion on the relevant product market, holding that he:  (1) failed to properly apply the SSNIP methodology; (2) failed to consider several "practical indicia" of the outer bounds of a product market as set forth in *Brown Shoe Co. v. United States,* 370 U.S. 294, 325 (1962); and (3) failed to consider cross-elasticity of supply.  *See In re Live Concert Antitrust Litig.,* 863 F. Supp. 2d at 986-94.

In rejecting Dr. Phillips' SSNIP test, the *Live Concert* court determined that Dr. Phillips did not reliably apply the SSNIP methodology.  *Id.* at 986-89.  Though Dr. Phillips recognized that a proper SSNIP methodology requires starting with a narrow market definition and then expanding that definition until all reasonable substitutes were included, he did not consider *any* substitutes and did not test his assumptions.  *Id.* at 987-89.  His failure to analyze narrower or broader product markets rendered his SSNIP test unrealizable under Rule 702.  *Id.* at 986.  The same is true for Dr. Williams.  His version of the SSNIP test is under-inclusive on both

---

[6] Counterclaim-Defendants do not dispute that a properly conducted SSNIP test can be an accepted means of antitrust analysis.

MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE DR. WILLIAMS' TESTIMONY

1  sides of the upstream technology market—on the seller's side, it fails to consider

2  that the portfolio licenses offered by MPEG LA compete with the licenses offered

3  by individual ATSC patent holders, and, on the buyer's side, it fails to consider

4  viable alternatives to licensees for switching to monitors or negotiating licenses

5  independently from the ATSC patent holders.

6       Further, Dr. Williams identifies no methodology for his so-called SSNIP test

7  and conducts no independent calculations.  The *Live Concert* court recognized that a

8  SSNIP test is an "iterative process," but Dr. Williams identifies no process at all,

9  much less an iterative one.  *Id.* at 987.  Dr. Williams merely ██████████████████

10 ████████████████████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████  (Williams Report

13 ¶¶ 74, 81.)   That is the extent of his analysis. That is not a SSNIP test, by any

14 definition recognized by the *Merger Guidelines* or by the case law.

15      Regardless of what Dr. Williams calls it, the test is economically incapable of

16 defining a relevant antitrust market or allowing a reliable assessment of monopoly

17 power.   It is a vacuous test with no power of economic assessment, and it is

18 therefore unhelpful to the trier of fact and unreliable under accepted economic

19 principles.  *See AFMS LLC v. United Parcel Service Co., FedEx Corp.*, Case No.

20 CV 10-5830, slip op., at 5 (C.D. Cal. Feb. 4, 2014) [Ex. A to Counterclaim-

21 Defendants' Request for Judicial Notice] (hereinafter "*AFMS*") (excluding expert

22 testimony that was: (1) not testable by the court because the expert did not explain

23 his methodology; (2) based on "'soft' qualitative evidence instead of 'rigorous'

24 economic tests"; and (3) not derived from definable economic principles).  At its

25 core, the SSNIP test is designed to measure consumer options and decisions, but Dr.

26 Williams ignores consumers in both markets entirely.  (*See* Layne-Farrar Report ¶¶

27 35-37.)

28

17

Because Dr. Williams failed to properly apply a SSNIP test, his opinions and testimony regarding the upstream technology market must be excluded.[7] *See Kentucky Speedway, LLC v. NASCAR, Inc.*, 588 F.3d 908 (6th Cir. 2009) (affirming exclusion of expert that "used his own version" of the SSNIP test and failed to consider proper substitutes); *In re Fresh Del Monte Pineapples Antitrust Litig.*, No. 04-md-1628(RMB)(MHD), 2009 WL 3241401, at *7 (S.D.N.Y. Sept. 30, 2009) (excluding expert's purported SSNIP test because applied methodology did not meaningfully consider whether other products were reasonable substitutes).[8]

---

[7] The absence of a proper application of the SSNIP test in Dr. Williams' report is "particularly troublesome in the antitrust arena where economic models and analysis are required." *AFMS*, at 10. This is especially true "in the antitrust context [where] . . . many courts . . . are increasingly skeptical of plaintiffs' experts who offer only generalized and theoretical opinions that a particular methodology may serve this purpose without also submitting a functioning model that is tailored to market facts in the case at hand." *Id.* (quoting *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 492 (N.D. Cal. 2008)). It is beyond dispute that Dr. Williams has not "submit[ed] a functioning model that is tailored" to this case because he has not submitted a model whatsoever, let alone one that can be tested. *Id.*

[8] The *Live Concert* court identified two additional deficiencies in Dr. Phillips' analysis that are also present in Dr. Williams' analysis. *First*, Dr. Phillips, like Dr. Williams, did not calculate the cross-elasticity of demand or supply. *Id.* at 988-89. Although that failure alone might not be "fatal" to a proposed market definition, Dr. Phillips also failed to consider the *Brown Shoe* "practical indicia" of interchangeability: "(1) industry or public recognition of the market as a separate economic entity; (2) the product's peculiar characteristics and uses; (3) unique production facilities; (4) distinct customers; (5) distinct prices; (6) sensitivity to price changes; and (7) specialized vendors." *Id.* at 989. Likewise Dr. Williams did not conduct a qualitative analysis of the *Brown Shoe* factors, or whether such factors were economically significant. His purported hypothetical monopolist test and his upstream market opinions fail to satisfy Rule 702 for this additional, independent reason.

*Second*, Dr. Phillips' failure to consider cross-elasticity of supply likewise undermined his proposed market definition. *Id.* at 993-94. Because a reasonable market definition must consider cross-elasticity of both demand and supply, and Dr. Phillips did not evaluate supply-side evidence, his testimony was not reliable or

Dr. Williams also failed to consider factors relevant to implementing the hypothetical monopolist test, which similarly demonstrates the flaws in his methodology.  The *Merger Guidelines* outline eight categories of reliable evidence that can demonstrate consumers' responses to higher prices including, *inter alia*: "information from buyers, including surveys, concerning how they would respond to price changes;" "objective information about product characteristics and the costs and delays of switching products, especially switching from products in the candidate market to products outside the candidate market;" "evidence from other industry participants, such as sellers of complementary products;" and "the influence of downstream competition faced by customers in their output markets." (*Merger Guidelines* at 11-12.)  Dr. Williams did not analyze any of these factors, and his analysis is thus unable to demonstrate "the extent to which customers would likely substitute away from the products in the candidate market in response to such a price increase and on the profit margins earned on those products" as required by the hypothetical monopolist test.  (*Id.* at 11.)

In short, Dr. Williams identified an accepted methodology—the SSNIP test—but did not employ that methodology, and thus his testimony is inadmissible.  *See e.g., McLaughlin Equip. Co. v. Servaas*, No. IP-0127-C-T/K, 2004 WL 1629603, at *6 (S.D. Ind. Feb. 18, 2004) ("It is not sufficient for an expert to selectively apply some (favorable) factors of an approved methodology such as the *Horizontal Merger Guidelines*."); *In re TMI Litig. Cases Consol. II*, 911 F. Supp. 775, 825-26 (M.D. Pa. 1996) (excluding expert analysis that "loosely resemble[d] a traditional . . . methodology" because "[i]t is not a generally accepted practice to discard a key step in the standard methodology").  Dr. Williams' purported hypothetical monopolist test is inadmissible under Rule 702 because—despite Dr. Williams'

---

helpful.  *Id.*  Dr. Williams' testimony is even further afield and less helpful than Dr. Phillips'.  Dr. Williams did not consider cross-elasticity of demand *or* cross-elasticity of supply.

MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE DR. WILLIAMS' TESTIMONY

1  characterization—it is not a reliable method, is unhelpful to the Court or a jury, is

2  based on insufficient facts and data, and was improperly and unreliably applied to

3  the facts of this case.

4      *Natural Experiment Analysis*.  Dr. Williams' "natural experiment" analysis is

5  also inadmissible under Rule 702 because it is unreliable and not a reliable

6  methodology, despite Dr. Williams' conclusory description.  Dr. Williams' two-

7  sentence conclusion that ████████████████████████████████████

8  ██████████ is pure *ipse dixit*.  The *Merger Guidelines* explain that the agencies

9  sometimes make "[d]irect [c]omparisons [b]ased on [e]xperience" by looking to the

10  measurable *effects* of "historical" or "analogous" events in order to predict the

11  effects of the merger at issue.  (*See Merger Guidelines*, at 3.)  Dr. Williams cannot

12  use the underlying challenged conduct as a "natural experiment" because he does

13  not look at any purported effects of the underlying conduct; furthermore, his

14  purported "experiment" is limited to the very conduct at issue in this case and

15  references no historical or analogous situation.  (*See* Layne-Farrar Report ¶¶ 99-

16  103.)  Counterclaim-Defendants are aware of no case allowing such evidence to be

17  admissible.

18      Moreover, Dr. Williams ignores a natural experiment cited in Sceptre's own

19  Counterclaim—in 1997, the DOJ concluded that a different patent pool administered

20  by MPEG LA was unlikely to be anticompetitive and, to the contrary, had

21  potentially significant pro-competitive effects. (*See* DOJ MPEG-2 Letter.)  Further,

22  because Dr. Williams fails to provide any explanation of his analysis, the Court, the

23  jury, and Counterclaim-Defendants are left to guess at the underlying process and

24  methods underlying his conclusion.  Dr. Williams' opinions and testimony about a

25  natural experiment should similarly be excluded under Rule 702 because they are

26  not helpful to the trier of fact and because they are not the product of any reliable

27  method.

28

MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE DR. WILLIAMS' TESTIMONY

1    For all of the foregoing reasons, the opinions and testimony set forth in

2    Section IV of the Williams Report fail to meet the standards of Rule 702 and

3    *Daubert*, and they are therefore inadmissible at summary judgment and at trial.[9]

4    **III.    Dr. Williams' Opinions As to Alleged Injury to Sceptre Are Inadmissible.**

5    Dr. Williams' opinions in Section V of the Williams Report are inadmissible

6    because they are not helpful to the trier of fact, are not the product of any reliable

7    economic analysis, are based on insufficient facts, and do not fit the facts of this

8    case.  *See generally* Fed. R. Evid. 702; *Daubert*, 509 U.S. 579.

9    *First*, Dr. Williams identifies no alleged injury to Sceptre other than generally

10   asserting ████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████

12   (Williams Report ¶¶ 95-99.)   Because there is no analysis behind the conclusion—

13   let alone an identification of specific conduct by any particular Counterclaim-

14   Defendant and when it occurred—it is tantamount to a legal conclusion and

15   unreliable at best.  *See Therasense, Inc. v. Becton, Dickinson & Co.*, No. C 04-

16   02123 WHA, 2008 WL 2323856, at *1 (N.D. Cal. May 22, 2008) ("[T]he attempted

17   spoon-feeding of client-prepared and lawyer-orchestrated 'facts' to a hired expert

18   who then 'relies' on the information to express an opinion" is "[o]ne of the worst

19   abuses in civil litigation.").

20   *Second*, Dr. Williams concludes without any analysis that Sceptre would have

21   paid for an ATSC patent pool license if a rate lower than $5 would have been

22   offered.   However, Dr. Williams' opinion disregards the extensive documentary

23   _____

24   [9] Notably, the entirety of the section of Dr. Williams' report on the topic of
     "Anticompetitive effects of the supra-FRAND royalty rate" amounts to nothing

25   more than a literature review of the topic.  (*See* Williams Report ¶¶ 90-94.)  Dr.
     Williams does not link that purported summary to a single record fact or document

26   in this case.  Thus, these particular opinions do not meet *Daubert*'s "fit" requirement

27   and are inadmissible for this additional, independent reason.  *Daubert*, 509 U.S. at

28   591.

MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE DR. WILLIAMS' TESTIMONY

record of Sceptre's failure to respond to MPEG LA's repeated attempts—on behalf of Plaintiffs—to negotiate a license since as early as 2008 and disregards the absence of any evidence that Sceptre was willing to license a single patent from anyone at any rate.  (*See* Williams Dep. 202:22-214:1; Ondeck Decl. Exs. F-T.)[10]

Instead, Dr. Williams' opinion is based on two things: ████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████         (*See* Williams Dep. 32:1-34:18; 211:16-214:1; Williams Report ¶ 96; *cf. Merger Guidelines*, at 4 ("Documents created in the normal course are more probative than documents created as advocacy materials in merger review.").)[11]

Dr. Williams "cites no specific facts in the record . . . which support [his] opinion, and the only available evidence contradicts it." *Estate of Gonzalez v. Hickman*, No. ED CV 05-660 MMM, 2007 WL 3237727, at *3 n.34 (C.D. Cal May 30, 2007).   That failure renders his opinion inadmissible. *Id.; see also Western Parcel Express v. United Parcel Services of Am., Inc.*, 65 F. Supp. 2d 1052, 1060 (N.D. Cal. 1998) ("When expert opinions are not supported by sufficient facts, or when the indisputable record contradicts or otherwise renders the opinions unreasonable, they cannot be relied upon.").   The available record evidence is "inconvenient" for Dr. Williams' conclusions, but that does not mean that he can

---

[10] At his deposition, Dr. Williams ████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████ (Williams Dep. 213:10-214:1.)

[11] It is not reasonable that Ms. Chou's statement is the cornerstone for Dr. Williams' conclusion.  No reasonable economist would simply accept the self-serving statement of an interested party as fact. *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1080 n.4 (10th Cir. 2006).

MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE DR. WILLIAMS' TESTIMONY

1   ignore it.  *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055-57 (8th

2   Cir. 2000) (expert evidence "should have been excluded" where it "construct[ed] a

3   hypothetical market which was not grounded in the economic reality . . . [and]

4   ignored inconvenient evidence").  Because Dr. Williams' conclusion is not based on

5   any facts or admissible evidence, this Court should "conclude that there is simply

6   too great an analytic gap between the data and the opinion proffered."  *See General*

7   *Elec. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Abarca v. Merck & Co.*, No.

8   1:07cv0388 OWW DLB, 2010 WL 4643642, at *4 (E.D. Cal. Nov. 9, 2010)

9   (explaining that "an expert's opinion may not be based on assumptions of fact

10  without evidentiary support . . . .") (citation omitted).

11      Dr. Williams ███████████████████████████████████████

12  ███████████████████████████████████████████████████████

13  ██████████████████████   (Layne-Farrar Report ¶ 18.)   Additionally, Dr. Williams

14  does not consider that Sceptre could have instead attempted to negotiate directly

15  with ATSC patent holders or could have feasibly switched its business to selling

16  monitors.  It is telling that Dr. Williams ██████████████████████████

17  ███████████████████████████████████████████████████████

18  ████████████   (Williams Report ¶ 97), yet omits the option selected by Sceptre

19  itself—willfully refusing to pay royalties and refusing to negotiate with MPEG LA,

20  while pocketing six years' worth of patent piracy profits.   Unsupported and

21  conclusory testimony based on an expert's say-so does not support a finding of

22  reliability—"nothing in either *Daubert* or the Federal Rules of Evidence requires a

23  district court to admit opinion evidence that is connected to existing data only by the

24  *ipse dixit* of the expert."  *Kumho Tire*, 526 U.S. at 157.

25      Therefore, each of the foregoing flaws and deficiencies in Dr. Williams'

26  analysis are independently and collectively fatal to the admissibility of the opinions

27  set forth in Section V of Dr. Williams' Report.  These opinions should therefore be

28

23

excluded under Rule 702 because they are unhelpful to the trier of fact, are unreliable, disconnected from the facts of the case, and not the product of reliable economic methods.

## CONCLUSION

For the foregoing reasons, Counterclaim-Defendants respectfully request that the Court grant their Motion to Exclude Selected Opinions of Dr. Michael A. Williams, including the opinions set forth in Sections IV and V of Dr. Williams' Report, both in connection with Counterclaim-Defendants' Motion for Partial Summary Judgment and at trial.[12]

Dated: January 11, 2016   PROSKAUER ROSE LLP
           By:  */s/ Christopher E. Ondeck*

           *Attorneys for Counterclaim-Defendants Zenith*
           *Electronics LLC, Panasonic Corporation, U.S.*
           *Philips Corporation, and MPEG LA, LLC*

---

[12] If Sceptre's non-patent Counterclaims survive summary judgment, Defendants reserve their rights to seek the exclusion of Dr. Williams' testimony at trial in its entirety.  For various reasons, Defendants believe that Dr. Williams' *entire* report may be inadmissible, even if Defendants are not at this time seeking to exclude it in its entirety.  (*See* Layne-Farrar Report ¶ 13 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮));  *see also St. Paul Fire and Marine Ins. Co. v. Nolen Group, Inc.*, No. Civ. A. 02-8601, 2005 WL 1168380, at *9-10 (E.D. Pa. May 13, 2005) (Though "an expert may rely on the work of others . . . the expert must be able to testify to the veracity of that work. . . . [A]n expert cannot simply be the mouthpiece of another expert.").

24